**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT ASHLAND**

**CIVIL ACTION NO. 09-80-DLB-EBA**

**EUGENE ADKINS,**                                                                          **PLAINTIFF**

and

**UNITED WISCONSIN INSURANCE COMPANY, d/b/a
UNITED HEARTLAND**                                         **INTERVENOR PLAINTIFF**

**vs.**

**AK STEEL CORPORATION**                                            **DEFENDANT/
THIRD PARTY PLAINTIFF**

**vs.**

**RELCO FINANCE, INC., ET AL.**                      **THIRD-PARTY DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

\* \* \* \* \* \* \* \* \*

Plaintiff Eugene Adkins ("Adkins") commenced this negligence action against Defendant AK Steel Corporation ("AK Steel")[1] after Plaintiff suffered a workplace injury when he slipped and fell off a quench locomotive that his employer, Third Party Defendant Relco Locomotives, Inc. ("Relco Locomotives"), was under contract to service and maintain at AK Steel's coke manufacturing plant. Plaintiff alleges that pursuant to an agreement between AK Steel and Relco Locomotives, the locomotives were to be cleaned by AK Steel employees prior to providing access to Relco Locomotives employees to maintain or repair

---

[1] Plaintiff also named AK Steel Holding Corporation ("AK Steel Holding"), the corporate parent of AK Steel, as a party defendant in his Complaint (Doc. # 1). However, AK Steel Holding was subsequently dismissed from this action (Doc. # 14).

them. Thus, AK Steel's alleged failure to clean this particular locomotive and to warn Plaintiff of the same was a direct and proximate cause of his injury.

Thereafter, AK Steel filed a Third-Party Complaint (Doc. # 25) against Third Party Defendants Relco Locomotives and Relco Finance, Inc. ("Relco Finance"). In turn, Relco Locomotives and Relco Finance filed counterclaims against AK Steel (Doc. # 34). United Wisconsin Insurance Company d/b/a United Heartland ("UWIC"), who provides workers' compensation insurance coverage for Relco Locomotives employees and has provided benefits to Plaintiff, also filed an Intervening Complaint (Doc. # 53). As this Court's jurisdiction is premised on diversity, Kentucky's choice of law rules apply.

This matter is currently before the Court on Defendant AK Steel's Motion for Summary Judgment (Doc. # 59). The motion has been fully briefed, (Docs. # 59, 60, 62), and the matter is now ripe for review. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

AK Steel is the owner and operator of a coke manufacturing plant (Coke Plant) located in Ashland, Kentucky. AK Steel uses locomotive engines to transport both coal and coke within the Coke Plant and to other AK Steel facilities. The principal production facilities at the Coke Plant are two separate, but connected, coke batteries–# 3 Battery and # 4 Battery. The # 4 Battery consists of 72 parallel and adjoining ovens, and the # 3 Battery is an arrangement of 76 similar, but somewhat smaller, ovens. At both Batteries, coal is charged from the top into three charging holes and then baked in the absence of oxygen for eighteen to twenty-two hours to remove impurities and combustible properties.

When the coking process is complete, the oven doors are removed and a pushing machine on the riverside of the Batteries "rams" the coke through the oven and into a quench car basket on the hillside of the structure. Then, the coke is transported by a quench locomotive, pushing or pulling the quench car basket, to a quenching station where water is sprayed on the material to cool it. Finally, the coke is returned to a dumping wharf and transferred to a system of conveyors which move the cooked coke to other sizing, separating and loading facilities.

On June 2, 2006, AK Steel entered into a Locomotive Lease Agreement with Relco Finance. The agreement provided that Relco Finance would lease to AK Steel three quench locomotives, accessories, attachments, devices and other associated equipment to be used in the movement of coke from the ovens at the # 3 Battery and the # 4 Battery to the quench station and then back to the wharf for transport to other processing facilities. On June 2, 2006, AK Steel also entered into a separate Locomotive Maintenance Agreement with Relco Finance. This agreement provided that Relco Finance agreed to perform certain maintenance, service and repair work on the quench locomotives during the terms of the Locomotive Lease Agreement. Relco Finance then subcontracted the maintenance and service work under the Locomotive Maintenance Agreement to its affiliated company, Relco Locomotives.[2]

---

[2] A review of the record reveals that the June 2, 2006 agreements were not the first interactions between the parties. While the exact date is unknown, at some point prior to the June 2, 2006 Locomotive Lease Agreement, Relco Finance also supplied yard locomotives for use at AK Steel's Coke Plant. AK Steel employee, William Taylor, estimated that the relationship between AK Steel and Relco Finance began at some point in the 1990s. Furthermore, on August 25, 2000, AK Steel and Relco Locomotives entered into a "Contractors and Service Providers Master Agreement" whereby Relco Locomotives agreed to "furnish all labor, tools, and equipment necessary to perform the work covered by any purchase orders or service orders which [AK Steel] might issue to [Relco Locomotives] ... ." (Doc. # 25-2, at 1).

Four Relco Locomotives employees, including Adkins, were designated to the AK Steel Coke Plant. One employee, Michael Jordan, worked at the Coke Plant full-time. The employees were also required to be on-call for emergency service work. Because of the harsh conditions that the locomotives were exposed to, a locomotive would only operate for three or four days before it needed to be serviced again. Jordan testified that he was under an extreme amount of pressure to keep the locomotives running. Indeed, pursuant to the agreement between AK Steel and Relco Finance, if the locomotives were inoperable and caused coke production to stop, Relco was financially responsible for the lost production time.

Prior to the lease and maintenance agreements with Relco Finance, AK Steel owned, operated, serviced and maintained its own locomotives for the transport of coal and coke at the Coke Plant and between its facilities. However, the locomotives owned by AK Steel were manufactured in the 1940s. They were much simpler in design than the modern locomotives and required simpler tools and techniques to repair and maintain them. They were not the modern "quench" locomotives and were not designed to be used as such. They were actually "yard-switcher" locomotives to be used only in small scale operations.[3]

The quench locomotives that Relco Finance leased to AK Steel were much more powerful than AK Steel's previously owned locomotives and were equipped with sophisticated computers and electronics. They required specialized maintenance and

---

[3] Although several of the AK Steel and Relco Locomotives employees referred to AK Steel's old engines as "quench" locomotives in their depositions, Plaintiff, in a sworn affidavit, maintains that AK Steel only owned "yard-switcher" locomotives. Viewing the evidence in a light most favorable to Plaintiff, the Court assumes that AK Steel never owned "quench" locomotives.

repair and necessitated skilled personnel who were highly trained in this particular type of locomotive. AK Steel employees lacked the specialized skill necessary to perform the maintenance, repair and refurbishing required of the modern quench locomotives.

Adkins began working for Relco Locomotives in September 2005 as a Field Service Technician. Pursuant to his employment, he performed technical service work at AK Steel's coke manufacturing plant. The first locomotive that Adkins serviced at AK Steel was a yard locomotive, as the quench locomotives did not arrive until 2007. Thereafter, he began servicing the three quench locomotives, in addition to the yard locomotives.

On October 3, 2008, Adkins was working at the AK Steel coke manufacturing plant. During the course of the day, he was asked to inspect one of the quench locomotives by a fellow employee who believed the wheels looked too thin to operate.[4] After checking one side of the locomotive's wheels, Adkins climbed up on top of the engine's walkway to access the other side. As Adkins turned to descend, he lost his footing and fell down the stairwell, sustaining multiple injuries. Adkins contends that he slipped and fell as a result of coke particles that had not been cleared from the walkway.

After the incident, Adkins filed a Workers' Compensation Claim in Illinois. He received temporary total disability weekly payments from October 2009 to June 2010. Later, Plaintiff settled his claim for benefits through a lump sum payment with a Medicare set-aside to cover future medical expenses.

---

[4] While the other Relco Locomotives employees were qualified to take wheel measurements, Adkins had the most experience and was responsible for deciding what action needed to be taken with respect to the locomotives.

## II. ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to

6

direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

### B. Kentucky Substantive Law Applies

A federal court sitting in diversity applies the choice of law rules of the forum state to determine which jurisdiction's substantive law controls. *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001); *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). Furthermore, this Court is mindful that "Kentucky's conflict of law rules favor application of its own law whenever it can be justified." *Johnson v. SOS Transp., Inc.*, 926 F.2d 516, 519 n.6 (6th Cir. 1991). Kentucky articulates two different choice of law rules with respect to contract and tort actions. Kentucky precedent dictates that the "any significant contacts" test applies to tort actions, whereas the Restatement's "most significant contacts" test applies to contract disputes. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009) (citing *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972)).

Since the instant action involves a negligence claim, the "any significant contacts" test applies. Plaintiff is a resident of West Virginia. As a result of his injury, he filed a workers' compensation claim in Illinois. However, Plaintiff's injury occurred in Kentucky, and he brought this action in a Kentucky court. According to the Kentucky Supreme Court, in tort actions, "if the accident occurs in Kentucky ... there is enough contact from that fact alone to justify applying Kentucky law." *Arnett v. Thompson*, 433 S.W.2d 109, 113 (Ky. 1968). Consequently, the occurrence of the injury in Kentucky provided sufficient contact, and the substantive law of Kentucky applies to the instant action. *See Petronis v. Churchill*

7

*Downs, Inc.*, No. 2005-CA-001925, 2007 WL 1520018, at *3 (Ky Ct. App. July 13, 2007) (holding that Kentucky law controls when workplace injury occurs in Kentucky, even though Plaintiff was domiciled and covered by workers' compensation benefits in New York).

### C. Exclusivity Under Kentucky's Workers' Compensation Act

In its Motion for Summary Judgment, Defendant argues that it is entitled to judgment as a matter of law because Plaintiff is barred, under the Kentucky Workers' Compensation Act (KWCA), from bringing a tort action against it. AK Steel relies on the exclusivity provision of the KWCA, which provides, in pertinent part:

> If an employer secures payment of compensation as required by this chapter, *the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee* ... . For purposes of this section, *the term "employer" shall include a "contractor" covered by subsection (2) of K.R.S. § 342.610*, whether or not the subcontractor has in fact, secured the payment of compensation.

K.R.S. § 342.690(1) (emphasis added). A "contractor" is defined as a person who contracts with another "[t]o have work performed of a kind which is a *regular or recurrent part of the work of the trade, business, occupation, or profession of such person* ... ." K.R.S. § 342.610(2)(b) (emphasis added). Accordingly, if AK Steel contracted with Relco Locomotives to perform work that was a regular or recurrent part of AK Steel's business, it is immune from tort liability to Adkins.[5] *See Fireman's Fund Ins. Co. v. Sherman &*

---

[5] Although the parties do not raise the issue, the exclusive remedy provision only applies if the employer "secures payment of compensation as required by this chapter ... ." K.R.S. § 342.690(1). An employer or contractor can "secure payment of compensation" without purchasing workers' compensation insurance itself; it can hire a subcontractor and require the subcontractor to purchase workers' compensation coverage that meets the state requirements. *Himes v. United States*, 645 F.3d 771, 779 (6th Cir. 2011). In the instant case, the record reveals that pursuant to the Contractors and Service Providers Master Agreement between AK Steel and Relco Locomotives, AK Steel required Relco Locomotives to comply with Kentucky's workers' compensation laws. (Doc. # 25-2, at 2). Therefore, AK Steel "secure[d] payment of compensation" as required by the KWCA and is entitled to raise the exclusive remedy defense.

*Fletcher*, 705 S.W.2d 459, 461 (Ky. 1986). This is commonly referred to as "up-the-ladder" immunity. *Gen Elec. Co. v. Cain*, 236 S.W.3d 579, 585 (Ky. 2007).

However, just as a contractor is entitled to up-the-ladder immunity, it is also subject to up-the-ladder liability, meaning that the contractor is liable for workers' compensation benefits to its subcontractors' employees unless the subcontractor provides coverage. *Id.* at 585 (quoting K.R.S. § 342.610(2)) ("A contractor who subcontracts all or any part of a contract ... shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor ... has secured the payment of compensation as provided for in this chapter ... ."). Indeed, the purpose of K.R.S. § 342.610(2)(b) "is not to shield owners or contractors from potential tort liability but to assure that contractors and subcontractors provide workers' compensation coverage." *Id.* at 587 (citing *Elkhorn-Hazard Coal Land Corp. v. Taylor*, 539 S.W.2d 101, 103-04 (Ky. 1976)). Thus, a defendant who asserts up-the-ladder immunity must both plead and prove the affirmative defense. *Cain*, 236 S.W.3d at 585. "Even when the underlying facts are undisputed, a conclusion that a defendant is entitled to judgment as a matter of law must be supported with substantial evidence that a defendant was the injured worker's statutory employer under a correct interpretation of KRS 342.610(2)(b)." *Id.* (citing *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986)).

Defendant claims that AK Steel is a "contractor" as defined in K.R.S. § 342.610(2)(b) because the work that Adkins performed–the maintenance of locomotives used by AK Steel to transport coal and coke within its facility–is a regular and recurrent part of its coke manufacturing business. On the other hand, Plaintiff argues that Defendant has

9

failed to meet its burden to demonstrate that the maintenance Adkins was performing when injured was a regular or recurrent part of AK Steel's coke manufacturing business. Plaintiff asserts that because AK Steel's workers did not possess the skilled manpower or tools required to repair and/or maintain the modern quench locomotives, the work Adkins performed was not a regular or recurrent part of AK Steel's coke manufacturing business.

Most recently, the Kentucky Supreme Court held "regular or recurrent work" refers to "work that is customary, usual, or normal to the particular business (including work assumed by contract or required by law) or work that the business repeats with some degree of regularity, and it is of a kind that the business or similar businesses would normally perform or be expected to perform with employees." *Cain*, 236 S.W.3d at 588. The Court cautioned that the test "is relative, not absolute" and identified factors relevant to the decision, including the "nature, size and scope" of the particular business and "whether it is equipped with the skilled manpower and tools to handle the task the independent contractor is hired to perform." *Id.* (citations omitted). However, "even though [an employer] may never perform that particular job with his own employees, he is still a contractor if the job is one that is usually a regular or recurrent part of [its] trade or occupation." *Fireman's Fund*, 705 S.W.2d at 462; *see also Franke v. Ford Motor Co.*, 398 F. Supp. 2d 833, 839 (W.D. Ky. 2005); *Blasko v. Mercy Health Partners-Lourdes, Inc.*, No. 2009-CA-000742, 2010 WL 5018168, at *4 (Ky. Ct. App. Dec. 10, 2010); *Daniels v. Louisville Gas & Elec. Co.*, 933 S.W.2d 821, 824 (Ky. Ct. App. 1996) (emissions testing required by the EPA constitutes a regular or recurrent part of a coal fired electric plant's business, even though the testing was performed by contracted experts rather than plant's

own employees).

In this case, the facts are undisputed. As part of its coke manufacturing process, AK Steel utilizes locomotive engines to transport coke between different locations within the Coke Plant. In particular, the locomotives transfer coke from the ovens to the quenching station and then to the dumping wharf, where the coke is moved by conveyors to other sizing, separating and loading facilities. Prior to the June 2, 2006 agreement with Relco Finance, AK Steel owned, operated, serviced and maintained its own locomotives for the transport of coke within the Coke Plant. However, these "yard-switcher" locomotives were built in the 1940s and were much simpler in design than the modern "quench" locomotives that Relco Finance leased to AK Steel in 2006. AK Steel never owned or serviced its own quench locomotives, and AK Steel employees lacked the specialized skill necessary to perform the maintenance, repair and refurbishing required of these modern locomotives. Pursuant to the 2006 lease agreement, Relco Locomotives was responsible for maintaining, servicing and repairing the quench locomotives during the terms of the lease. Relco Locomotives employees regularly performed maintenance and service work on the quench locomotives; in fact, one employee worked at the Coke Plant full-time. At the time of Adkins injury, he was inspecting one of the quench locomotive's wheels to determine whether it needed to be replaced.

The maintenance of locomotive engines was both a regular and recurrent part of AK Steel's coke manufacturing business. The use of locomotive engines was an essential component of AK Steel's coke production. The locomotives transported coke to various stations in the plant in order to complete the coking process. If the locomotives were inoperable, coke production ceased. For years, AK Steel owned, operated, serviced and

11

maintained its own locomotives to transport coke within the facility. In 2006, AK Steel leased more modern engines, called quench locomotives, from Relco Finance to replace the older ones and continued to utilize them in the movement of coke throughout the plant. At this time, AK Steel also contracted with Relco Locomotives to perform any maintenance, service and repair work on the quench locomotives. Because of the harsh conditions that the locomotives were exposed to, they had to be inspected, serviced and/or repaired every three to four days. One Relco Locomotives employee worked at the Coke Plant full-time, and all employees were routinely on-call for emergency services. Clearly, maintaining and servicing the locomotives for use in the coke production process was both a customary (i.e, regular) and continual (i.e., recurrent) part of AK Steel's business, and it was work that AK Steel had performed with its own employees for several years prior to the lease agreement with Relco Finance. *See Cain*, 236 S.W.3d at 588.

Moreover, it is well settled that "regular or recurrent" work includes routine repairs and maintenance projects. *Cain*, 236 S.W.3d at 588; *see also Thompson v. The Budd Co.*, 199 F.3d 799 (6th Cir. 1999) (maintenance of heating, ventilating and cooling system at an automobile parts stamping facility was regular and recurrent part of business); *Granus v. N. Am. Philips Lighting Corp.*, 821 F.2d 1253, 1257 (6th Cir. 1987) (rebricking a tank furnace used at a glass factory was a regular and recurrent part of defendant's glass making business); *Burroughs v. Westlake Vinyls, Inc.*, No. 5:07-CV-89, 2008 WL 5192237, at *5 (W.D. Ky. Dec. 11, 2008) (repair of pipes used to distribute defendant's product was a regular and recurrent part of defendant's business); *Franke v. Ford Motor Co.*, 398 F. Supp. 2d 833, 839 (W.D. Ky. 2005) (installation of new type of lift table used on the

12

production line at defendant's automobile manufacturing plant was regular and recurrent part of business); *Bratcher v. Conopco, Inc.*, No. 2003-CA-002153, 2008 WL 2065202, at *3 (Ky. Ct. App. May 16, 2008) (weekly mechanical maintenance on plumbing and piping at manufacturing plant was regular and recurrent part of business).

Plaintiff attempts to distinguish these authorities by arguing that the maintenance agreement between AK Steel and Relco did not concern any part of AK Steel's *physical plant*. However, this is simply a distinction without a difference and would indeed lead to inconsistent results. Although unintentional, Plaintiff actually demonstrates the fallacy of his argument via an example provided in his response brief. Plaintiff acknowledges that the coke oven is a vital and integral part of the coke manufacturing process, and, therefore, its maintenance would be considered a regular or recurrent part of AK Steel's business. This then begs the question why maintenance of the locomotives, which are also a vital and integral part of the coke manufacturing process, would not be considered a regular or recurrent part of AK Steel's business simply because they are not physically connected to the plant. As stated above, the use of locomotives was essential to AK Steel's coke manufacturing process–if the locomotives were inoperable, coke production stopped. Therefore, the maintenance of the locomotives was a regular and recurrent part of AK Steel's coke manufacturing business.

Plaintiff also argues that because AK Steel's workers did not possess the skilled manpower and tools required to repair and maintain Relco Finance's modern quench locomotives, the maintenance and repair of the locomotives was not a regular or recurrent part of AK Steel's business. Plaintiff maintains that Adkins performed work that AK Steel employees did not have the capability to perform. It appears that Plaintiff believes the

13

Kentucky Supreme Court's decision in *Gen. Elec. Co. v. Cain*, 236 S.W.3d 579 (Ky. 2007), created a new test for determining whether a subcontractor's work was a "regular or recurrent" part of the contractor's business. However, this very argument was rejected by the Kentucky Court of Appeals in *Forbes v. Dixon Elec., Inc.*, 332 S.W.3d 733, 739 (Ky. Ct. App. 2010) ("We do not believe that the Supreme Court [in *Cain*] created a new test, but rather it summarized the existing test."). As the court stated in *Cain*, the test is relative, not absolute, and whether a company is equipped with the skilled manpower and tools to handle the task the subcontractor was hired to perform is merely a factor to be considered in the analysis. *Cain*, 236 S.W.3d at 588.

In *Franke v. Ford Motor Co.*, the district court for the Western District of Kentucky addressed this very issue. 398 F. Supp. 2d 833. In *Franke*, the plaintiff argued that the instillation of a lift table at Ford's manufacturing plant was not a regular or recurrent part of Ford's business because the particular installation in which he was injured was unique for three reasons: (1) the lift table was a larger than average size of lift tables used at Ford; (2) the lift table was hydraulic, rather than pneumatic, and (3) the lift table was to be installed in a pit of greater than normal depth at Ford. *Id.* at 838. Moreover, the plaintiff asserted that the Ford workers were not equipped to perform the excavation work for the concrete pit in which the lift table was to be installed. *Id.* at 839. The court stated that "[e]ven if this installation was unique or even the first of its type, that does not resolve the dispute. The use of a contractor to perform a unique function does not mean that function cannot be 'regular and recurrent' under [K.R.S.] section 342.610(2)[(b)]." *Id.* Ultimately, the court found that because installation, removal and replacement of lift tables occurred

14

frequently at Ford and were an essential part of Ford's plant operations, the installation, replacement and repair of lift tables was a regular and recurrent part of Ford's business within the meaning of K.R.S. § 342.610(2)(b).

Similarly, in *Blasko v. Mercy Health Partners-Lourdes, Inc.*, the Kentucky Court of Appeals found that a subcontractor's employee, in her role as a perfusionist[6], was performing services that were a regular or recurrent part of operating a hospital that performs open-heart surgeries. 2010 WL 5018168, at *4. Lourdes was a hospital that contracted with Fresenius, the plaintiff's employer, to provide perfusion services to assist cardiac surgeons performing open-heart procedures at the hospital. *Id.* at 2. The plaintiff herself testified that a perfusionist is required at every open-heart surgery. *Id.* at 4. However, just as Adkins argues here, the plaintiff in *Blasko* argued that the hospital was not "equipped with the skilled manpower and tools to handle the task the independent contractor was hired to perform" because it contracted with Fresenius for perfusion services, employed no perfusionists of its own, and relied upon equipment supplied by Fresenius. *Id.* The court rejected this argument noting that it completely "misses the mark." *Id.* Because the plaintiff herself testified that a perfusionist plays an integral role in every open-heart surgery and Lourdes could not have performed these surgeries without a perfusionist present, the court found that "the services a perfusionist renders are a 'regular and recurrent part' of operating a hospital that performs open-heart surgeries." *Id.* at 4 (citing *Fireman's Fund*, 705 S.W.2d at 462).

---

[6] A perfusionist operates a heart-lung machine during open-heart surgeries that supports the circulatory and respiratory needs of the patient while allowing the surgeon to operate on a still, unbeating heart. *Blasko*, 2010 WL 5018168, at *1.

Here, too, Plaintiff "misses the mark" by arguing that because the maintenance and repair of the modern quench locomotives required more sophisticated and technical work than the yard-switcher locomotives and that AK Steel employees had never actually performed this kind of work, it precludes the application of up-the-ladder immunity. As stated above, it is well settled that "even though [an employer] may never perform that particular job with his own employees, he is still a contractor if the job is one that is usually a regular or recurrent part of [its] trade or occupation." *Fireman's Fund*, 705 S.W.2d at 462. Whether the work requires some measure of experience beyond the capabilities of AK Steel's employees, even if that specific work had never been performed on any prior occasion with AK Steel's employees, is merely a factor to consider in the analysis. *See Cain*, 236 S.W.3d at 588.

In this case, the maintenance and repair of locomotives occurred repeatedly at the Coke Plant. The locomotives are an essential part of AK Steel's business, as they are used to transport coke to various stations within the plant in order to complete the coking process. Plaintiff testified that, because of the harsh conditions at the plant, locomotives needed to be inspected and serviced every three or four days. Consequently, by any definition, the maintenance and repair of locomotives, although unique in certain ways, was a regular and recurrent part of AK Steel's coke manufacturing business pursuant to K.R.S. § 342.610(2)(b). Accordingly, Defendant AK Steel is entitled to summary judgment.

One final matter deserves brief comment. Third-Party Defendants Relco Finance and Relco Locomotives have filed a counterclaim against AK Steel alleging that they "are entitled to contractual and common law indemnity, including all costs, expenses and attorneys' fees incurred in defending the Third Party Complaint." (Doc. # 34, at 5).

Moreover, Intervening Plaintiff UWIC has filed an Intervening Complaint against AK Steel seeking damages in the amount of $266,624.98, the total amount of workers' compensation benefits extended to or on behalf of Adkins. (Doc. # 53, at 4).

In view of the dismissal of Plaintiff's claims versus AK Steel, there is no need to adjudicate AK Steel's third party complaint against Relco Locomotives and Relco Finance for indemnification. However, because not all claims against all parties are being adjudicated within this Memorandum Opinion and Order, the Court will withhold the entry of a final judgment pending the filing of status reports by Third Party Defendants Relco Locomotives and Relco Finance and Intervening Plaintiff UWIC.

## III. CONCLUSION

Having found that Defendant AK Steel contracted with Relco Locomotives to perform "work of a kind which is a regular or recurrent part" of AK Steel's coke manufacturing business, AK Steel is a "contractor" within the meaning of K.R.S. § 342.610(2)(b). Plaintiff Adkins' complaint is therefore barred by the exclusive remedy provisions of the Kentucky Workers' Compensation Act. Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1) Defendant/Third-Party Plaintiff AK Steel Corporation's Motion for Summary Judgment (Doc. # 59) is hereby **GRANTED**;

(2) Plaintiff Eugene Adkins' Complaint (Doc. # 1) is hereby **DISMISSED**;

(3) Defendant/Third-Party Plaintiff AK Steel Corporation's Third-Party Complaint (Doc. # 25) is hereby **DISMISSED**; and

(4)  **Within ten (10) days from the date of entry of this Order**, Third-Party Defendants Relco Locomotives and Relco Finance and Intervenor Plaintiff United Wisconsin Insurance Company shall file a joint and/or individual status reports identifying whether any of the remaining claims need to be adjudicated in view of the dismissal of Plaintiff Adkins' complaint against Defendant AK Steel; alternatively, the parties may submit an Agreed Entry of Dismissal of those claims.

This 9th day of September, 2011.



Signed By:
*David L. Bunning*
United States District Judge

G:\DATA\Opinions\Ashland\0-09-80 MOO Granting MSJ.wpd